# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,               CASE NO. 07-CR-20414

-vs-                            PAUL D. BORMAN
                                  UNITED STATES DISTRICT JUDGE

D-1 GEOFFREY FIEGER,
D-2 VERNON JOHNSON,

          Defendants.

_____/

## AMENDED[1] OPINION AND ORDER:

**(1) DENYING GOVERNMENT'S MOTION FOR RECONSIDERATION OF INTERIM ORDER OF NOVEMBER 16, 2005 RE GOVERNMENT'S EX PARTE SUBMISSIONS;**

**(2) GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTION FOR RECONSIDERATION OF INTERIM ORDER:**

    **(a) ORDERING THE GOVERNMENT TO DISCLOSE TO DEFENDANTS THE REASON FOR RECUSAL FROM THE INSTANT CASE OF THE TOP THREE PRINCIPALS OF THE DETROIT UNITED STATES ATTORNEYS' OFFICE; UNITED STATES ATTORNEY STEPHEN J. MURPHY; FIRST ASSISTANT UNITED STATES ATTORNEY TERRENCE G. BERG; SENIOR COUNSEL TO THE UNITED STATES ATTORNEY JONATHAN TUKEL. (ATT. 1). THIS DISCLOSURE SHOULD BE PROVIDED TO DEFENDANTS WITHIN SEVEN (7) DAYS OF THIS ORDER.**

    **(b) ORDERING THE GOVERNMENT TO PROVIDE TO DEFENDANTS WITH ITS REDACTED LIST OF E.D. MI CASES INVOLVING THE USE OF SIGNIFICANT NUMBERS OF FEDERAL AGENTS IN EFFECTUATING SIMULTANEOUS SEARCHES/INVESTIGATIONS.**

    **(c) DENYING DEFENDANT'S REQUEST FOR IDENTIFICATION OF A TRIAL LAWYER, INVESTIGATED BUT NOT PROSECUTED, FOR**

---

[1] There are three amendments to this Opinion and Order, one on page 11, and two on page 26.

**ILLEGAL FEDERAL CONTRIBUTIONS TO THE 2004 EDWARDS FOR PRESIDENT CAMPAIGN.**

Before the Court is Defendant Fieger's Motion for Reconsideration regarding the Court's Interim Order on Discovery (Doc. No. 102), and the Government's Motion for Reconsideration of the same Order (Doc. No. 107). The Interim Order relates to Defendant Fieger's Motion to Dismiss for Selective and Vindictive Prosecution.[2]

This case involves a ten count indictment; nine counts charge violations of the Federal Election Campaign Act ("FECA") (Johnson is not charged in four of the first nine counts) with regard to the 2004 Edwards for President Campaign; the tenth count charges Defendant Fieger with obstruction of justice.

Count I charges that both Defendant conspired to violate the FECA by:

> (a) using corporate funds to pay for more than $25,000 in campaign contributions to the 2004 [John] Edwards for President committee.
>
> (b) making more than $25,000 in contributions to the Edwards committee in the names of other persons.
>
> (c) causing the Edwards committee to unwittingly file false campaign finance reports.
>
> (d) defrauding the United States by preventing the Federal Election Commission ("FEC") from carrying out its responsibility to enforce the Election Act and provide accurate information to the public about amounts and sources of campaign contributions.

Count I alleges that the Defendants used corporate funds to make prohibited contributions totaling $127,000 and disguised them as legitimate payments. To carry this out, Defendants allegedly solicited "straw donors" to write checks to Edwards, and agreed to provide them with

---

[2] Co-Defendant Johnson has joined in this Motion. (*See* Hearing Trans. 10/16/07, at 6).

funds to make the contributions or to reimburse them. Among the straw donors recruited by Defendant were:

     i.     in March 2003, attorneys of the Fieger Law Firm Corporation and their spouses;

     ii.    in June 2003, children of attorneys, and non-attorney employees and their spouses;

     iii.   in September 2003, friends of Defendant Fieger;

     iv.   in January 2004, third party vendors of services to the Corporation as well as attorneys and support staff not-previously used as straw donors.

Count II charges Defendants with Making and Causing Conduit Campaign Contributions – causing contributions to be made in the names of others, when in fact the contributions were made by Defendants.

Count III charges Defendant Fieger only with making conduit contributions.

Count IV charges Defendants with making campaign contributions by a corporation, aggregating $25,000 or more during 2003.

Count V charges Defendant Fieger only with making corporate contributions in 2004 aggregating more than $25,000.

Counts VI and VII charge both Defendants with causing false statements to be made by the Edwards campaign to the FEC, showing that other individuals had made contributions when in fact they had been made by the corporation and the defendants. This same charge was contained in Counts VIII and IX, against Defendant Fieger only.

Finally, Count X charges Defendant Fieger only, with obstruction of justice, to wit: acting to conceal incriminating information and to provide false exculpatory information to the grand jury.[3]

---

[3] On January 7, 2008, the grand jury issued a superceding indictment containing the same 10 counts.

On November 16, 2007, this Court entered an Interim Opinion and Order re Government Ex Parte [*in camera*] Submissions Related To Defendants' Motion to Dismiss Indictment For Selective/Vindictive Prosecution. (Doc. No. 99). That Order referenced three categories of documents that had been submitted to the Court voluntarily by the Government, *ex parte* and *in camera*, in response to questions raised by the Court at hearings[4]:

> 1. a list of other Eastern District of Michigan federal criminal cases where a very large complement of agents was utilized in simultaneous search warrant executions, and interviews of individuals;

> 2. the reason for the recusal in November 2005 from further involvement in the instant investigation/prosecution by the top three ranking personnel in the Office of the United States Attorney for the Eastern District of Michigan; and

> 3. identification of the named subject of a Department of Justice campaign finance criminal investigation, a tort plaintiffs attorney contributor to the 2004 John Edwards for President campaign, that did not result in a prosecution.

Thereafter, the Court held one sealed *ex parte* hearing on the record on November 27, 2007 in response to the Government's request.

Defendants have consistently objected to the *ex parte, in camera* process, contending such communication is violative of their right to due process, and arguing that the recent Sixth Circuit decision in *United States v. Barnwell*, 447 F.3d 844 (6th Cir. 2007) requires that the *in camera* information should be provided to them.

## I.  BACKGROUND

This indictment charges illegal campaign contributions to an individual (John Edwards) seeking election for a federal office (President), bringing it within Federal jurisdiction. *See* Federal

---

[4] On October 30, 2007, the Court issued a scheduling order regarding the Government's submission of *ex parte* information, giving a deadline of November 2, 2007, and denying Defendant's opposition to the Government's providing "Secret Information" to the Court.

Prosecution of Election Offenses, 7th Ed. 2007, published by the U.S. Department of Justice, at 5-8 (hereinafter "Manual").

The Manual notes, that it is harder to obtain federal jurisdiction when there is no federal candidate on the ballot – no federal election process. Manual, 6-7. The Manual recognizes that "federal campaign financing law does not apply to violations of state campaign laws." *Id*. at 7. Nevertheless, the Manual states that while violation of state campaign financing "statutes are not by themselves, federal crimes, they may be evidence of other federal crimes," listing the "Hobbs Act, Travel Act or honest service offenses." *Id*. at 8.

The instant Government investigation in addition to the Edwards campaign, has also examined Defendant Fieger's financing regarding Michigan state election campaigns, but none of the charges relate to state campaigns.

The Court finds significant that from the initiation of the federal investigation in April 2005, the state judicial re-election campaign of former U.S. Attorney, now Michigan Supreme Court Justice, Stephen Markman was involved in this investigation. Specifically on April 13, 2005, when Eric Humphries, a former Fieger employee, walked into Detroit FBI offices and provided information that launched this investigation, he alleged campaign violations by Defendants Fieger and Johnson with regard to the 2004 Federal Edwards for President campaign, and the state re-election campaign of Michigan Supreme Court Justice Markman.

The local Assistant U.S. Attorney ("AUSA") who initiated this investigation, Lynn Helland, chief of the Special Prosecutions Unit, stated that the instant prosecution is the first such local federal election criminal case he had seen during his 25 year career. (Hearing Trans. 10/16/07, at 52). The instant case is not the usual federal criminal prosecution because it relates to activity –

political contributions – recognized by the Supreme Court as protected by the First Amendment. *See FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 440 (2001) ("[s]pending for political ends and contributing to political candidates both fall within the First Amendment's protection of speech and political association." (citation omitted)). At the same time, political contributions are not unregulated. Congress has enacted legislation, Federal Election Campaign Act ("FECA"), 2 U.S.C. § 431, and created an entity, the Federal Election Commission ("FEC"), to regulate contributions by limits and sources. Further, Congress has enacted criminal penalties for FECA violations, and in 2002, Congress passed the Bi-Partisan Campaign Reform Act providing for enhanced criminal penalties for certain FECA violations. *See* 2 U.S.C. §§ 437g(d)(1)(A), 437g(d)(1)(D).

The Department of Justice ("DOJ") has recognized the unique nature of election offenses by publishing a comprehensive Manual – Federal Prosecution of Election Offenses – required reading for Department attorneys and all local U.S. Attorney's offices. The Manual establishes that the DOJ has concluded that election campaign investigations, in particular those involving campaign financing, require special treatment because of First Amendment issues relating to federal elections, and because of the FEC's civil enforcement responsibilities. The Manual states in pertinent part:

> Justice Department supervision over the enforcement of all criminal statutes and prosecution theories involving . . . campaign financing crimes is delegated to the Criminal Division's Public Integrity Section. Thus, <u>Headquarters' consultation policy</u> is set forth in the <u>U.S. Dep't of Justice, U.S. Attorneys' Manual</u> (UJAM), Section 9-85.210.
>
> . . . .
>
> The Department's consultation requirements for election crime matters are designed to ensure that national standards are maintained for the federal prosecution of election crimes, that investigative resources focus on matters that have prosecutive potential, and that <u>appropriate deference is given to the FEC's civil enforcement responsibilities</u> over campaign financial violations. The requirements are also

intended to help <u>ensure that investigations</u> are pursued in a way that <u>respects both individual voting rights</u> and the states' primary responsibility for administering the electoral process.

. . . .

2.  Consultation Requirements for <u>Campaign Financing Crimes</u>.

<u>Additional considerations</u> come into play in <u>cases involving possible campaign financing violations</u> under FECA, notably, <u>the concurrent jurisdiction of the FEC to conduct parallel civil proceedings</u> in this area and <u>the resulting need to coordinate criminal law enforcement with the commission.  Therefore, consultation with the Public Integrity Section is required to</u>:

- <u>conduct any inquiry or preliminary investigation in a matter involving a possible campaign financing offense</u>;
- issue a subpoena or search warrant in connection with a campaign financing matter;
- present evidence involving a campaign financing matter to a grand jury;
- file a criminal charge involving a campaign financing crime; or
- present an indictment to a grand jury that charges a campaign financing crime.

. . . .

The Election Crimes Branch [of the Public Integrity Section] also serves as the point of contact between the Department of Justice and the FEC, which share enforcement jurisdiction over federal campaign financing violations.

. . . .

Manual, at 18 (emphasis added).

The Manual lists, three categories of election crimes: Election Fraud, Patronage Crimes and Campaign Financing Crimes.  The Manual first states that as to Election Fraud and Patronage Crimes (not at issue in the instant case):

United States Attorneys' Offices and FBI field offices <u>may conduct preliminary investigations of an alleged election fraud or patronage crime without consulting its Public Integrity Section</u>. . . . .  However, a preliminary investigation does not include interviewing voters during the pre-election or balloting periods concerning the circumstances under which they voted, as such interviews have the potential to

> interfere with the election process or inadvertently chill the exercise of an
> individual's voting rights.

Manual, at 17 (emphasis added). Thus, the DOJ Manual permits local federal investigations of vote

fraud and patronage crimes without prior consultation with the DOJ's Integrity Section. The Manual

treats campaign finance investigations differently: prior to beginning any such investigation, the

local AUSA must first consult with and be cleared by the DOJ Public Integrity section. The

Manual's mandated prior consultation with the DOJ Public Integrity Section by the Detroit U.S.

Attorney's office did not occur in the instant case.

The Government contends that this is an ordinary prosecution by ordinary local line

prosecutors. (Gov't Supp. Resp. Mot. Dismiss, at 12-13; Hearing Trans. 10/16/07, at 8, 10, 77, 79).

Yet, the Government acknowledges that this is not an ordinary prosecution; it is the first such

prosecution ever brought by the Detroit office. The Government also acknowledges that this

investigation was initiated locally in Detroit, and that the local prosecutors did not follow the DOJ

Manual by consulting with the DOJ's Public Integrity Section before beginning the investigation.

The fact that the DOJ Manual required prior consultation with Washington before even beginning

a local investigation establishes that the DOJ does not treat this as an ordinary prosecution.

Indeed, in addition to the admonition on page 18, the Manual sets forth the prior consultation

requirement with the DOJ for campaign finance investigations a second time:

> Accordingly, the Department requires that the Public Integrity Section be consulted
> before beginning any criminal investigation, including a preliminary investigation,
> of a matter involving possible violations of the FECA USAM § 9-85.210. This
> consultation is also required before any investigation of campaign financing
> activities under one of the Title 18 felony theories discussed above, as these
> prosecutive theories are based on FECA violations.

Manual, at 201 (emphasis added). The Manual, recognizes that "[t]he FEC is authorized by statute to conduct a civil inquiry parallel to an active criminal investigation involving the same matter. 2 U.S.C. §§ 437d(a)(9), 437(e). Parallel proceedings present unique challenges to federal prosecutors and investigators." Manual, at 202.

The local AUSA's failure to preliminarily contact the DOJ Public Integrity Section before beginning an investigation, removed the option of the DOJ initially consulting with the FEC prior to the investigation, and coordinating enforcement from the beginning between FEC and DOJ. Indeed, there has been no coordination of efforts between the DOJ with the FEC. The prosecutors acknowledged at a hearing, that the first contact in this case with the FEC was initiated by Defendant Fieger's counsel. This matter "was brought to the Federal Election Commission by Mr. Fieger, actually, by Mr. Cranmer after we executed our search warrant . . . . It was not until Mr. Fieger wrote a letter to the Federal Election Commission in . . . . late January of 2006, that the Federal Elections Commission was involved here." (Hearing Trans. 10/16/07, at 38). The only coordination between the DOJ and the FEC in the instant case, has been an agreement subsequently secured by the DOJ, that the FEC would not proceed with a parallel investigation. (Hearing Trans. 11/7/07, at 124-25, DOJ Attorney Kendall Day). They were not brought into the case in consultation with the DOJ. (Hearing Trans. 10/16/07, at 39, Helland). The Government conceded that the FEC was "a complete non-player." (*Id*.).

Additional evidence that this is not an ordinary prosecution is the fact that in November 2005, seven months after the local prosecution was initiated, the top three principal executives in charge of the Detroit U.S. Attorney's Office, U.S. Attorney Stephen J. Murphy, First Assistant U.S.

Attorney Terrence G. Berg, and Senior Counsel to the U.S. Attorney Jonathan Tukel, were ordered recused by the DOJ in response to their request to the DOJ for consideration of recusal.

The timeline regarding the eventual recusal of the top three officials of the Detroit U.S. Attorneys' office is significant. This local investigation began in April 2005;the top three official did not immediately recuse themselves from the case. The request to the DOJ for consideration of recusal did not occur until seven months later, in November, 2005. During that seven month period, the case investigation was ongoing, including grand jury proceedings.

In response to the Court's questions as to why the three principals did not immediately recuse themselves from the case, AUSA Helland stated that he could not answer the question without getting into information which he did not believe should be disclosed. (Hearing Trans. 12/14/07, at 46-47).

In response to the Court's follow-up questions as to whether an AUSA can recuse himself without asking Washington, e.g. if the case involves an AUSA's uncle or cousin, Mr. Helland stated "I don't know the answer to that." (*Id*. at 52).

As to Mr. Helland's relationship to the top three principal U.S. Attorney during that period, in response to the Court's questions did you talk with any of them, he stated that he "talked", but did not get "any direction." (Hearing Trans. 11/7/07, at 49). At a subsequent hearing, Mr. Helland admitted that he works for Mr. Murphy: "That's that chain of command." (Hearing Trans. 12/14/07, at 49).

Further evidence that this is not an ordinary prosecution is the fact that the instant federal grand jury proceedings went beyond inquiring into Federal election campaign finance violations, but also were directed at examining Defendant Fieger's role in the funding of opposition

advertisements against the state reelection campaign of Michigan Supreme Court Justice Stephen Markman, a former U.S. Attorney.[5]  The instant grand jury also investigated Defendant Fieger's contributions to a second state reelection campaign, that of Michigan Democratic Governor Jennifer Granholm.

Yet additional evidence that this is not just an ordinary prosecution is that there was, at a minimum, scheduling coordination efforts between the local U.S. Attorney's office and the Michigan Attorney General's office with regard to the investigation, of Defendant Fieger on the federal level (Edwards campaign), and on the state level (Markman and Granholm campaigns).  The Federal prosecutors acknowledged that when a state special prosecutor, who had been appointed by the State Attorney General to investigate Fieger, declined to pursue a state prosecution, the Detroit U.S. Attorneys office immediately sent an FBI agent with a search warrant, identical to the previous state subpoena, to seize all of the state-seized records for use in the federal investigation. Defendants contend that there was more than merely scheduling coordination, but rather a more significant continuing relationship.  (Hearing Trans. 12/14/07, at 62).

Defendants assert that this prosecution violates their constitutional rights to free speech and political association.  Defendants contend that the record provides "some" –enough– facts showing vindictive prosecution to permit them to proceed with discovery.  *Cf. United States v. Jones*, 159 F.3d 969, 978 (6th Cir. 1998) (finding a defendant had produced sufficient evidence to meet the "some evidence" standard applied to selective prosecution cases where he showed that eight non-

---

[5] Although the election ballot designates judicial races as non-partisan, candidates for the Michigan Supreme Court are nominated at party conventions.  Justice Markman was nominated by the Republican Party Convention.  The Court recognizes that there has been an independent Supreme Court candidate/justice nominated by petition; that, however, that did not occur in the state election at issue.

African-Americans arrested for crack cocaine were not referred for federal prosecution). The Government recognizes that *Jones* illustrates that the "some evidence" standard is not a significant hurdle, however, it argues that Defendants have not met this "some evidence" threshold. (Hearing Trans. 11/7/07, at 119-20; 126-28).

## II.     DISCUSSION

### A.     Documents Provided to the Court by the Government *Ex Parte, In Camera*

In response to the Court's questioning at hearings, the Government has voluntarily provided the Court with evidence, *ex parte*, *in camera*, as to three matters.

The first matter relates to the extensive amount of FBI resources devoted to this case. On the November 2005 evening when the Government simultaneously executed a search warrant at Defendant's law offices, and interviewed 30 election campaign contributors at their homes, the Government assembled a task force of over 75 agents. Eleven FBI agents went to Defendant Fieger's law offices, while 33 two agent teams (66) simultaneously appeared at homes of individual contributors, many of whom are Fieger employees. The Government elected to interview the individuals' at their homes at night, rather than at Defendant Fieger's office during daytime hours. AUSA Helland stated at a hearing "It's definitely a surprise to anybody to find out a federal agent is at the door. There's virtue in that. There's virtue in people being candid. It's – whether you agree with it or disagree with it, there is, in our opinion, a higher likelihood that witnesses are going to be candid if they are surprised, okay, not shocked, not destroyed, not distraught, but surprised." (Hearing Trans. 10/16/07, at 48, Helland). In addition, a television station was tipped off to the fact that this federal search warrant execution was occurring at Defendant Fieger's offices. (Hearing Trans. 10/16/07, at 36, Cranmer).

At a hearing, the Government sought to undercut Defendant's claim that the Government's simultaneous deployment of 75 agents in this case was unusual, and that this unusual fact supported Defendants' claim of selective and vindictive prosecution. The Government asserted that it was not unusual to utilize large numbers of agents in non-drug, non-violent crime cases in this district, and offered to supply the Court, *ex parte*, *in camera*, with examples of similar resource allocations in other Eastern District of Michigan cases. Thereafter, the Government did submit such a list, but sought *in camera* protection, to avoid revealing the names of the specific cases.

After viewing the Government's submission, the Court suggested to the Government that it could protect its interest, and at the same time, provide disclosure of this information to Defendants by redacting identifying information, i.e. deleting the names of the cases. This redaction would provide Defendants with the year of the case, the generic type of the case, and the number of agents utilized in a combined search warrant execution/interviews/arrest. Initially, the Government agreed to this resolution – "If we have to provide that discovery, we would be comfortable doing it in that format." (Hearing Trans. 12/14/07, at 32, Helland). Nevertheless, the Government concluded that to support its institutional argument that Defendants have not met the factual threshold required to justify any discovery, it will not provide any discovery information to Defendants relating to their claims of selective or vindictive prosecution.

The second matter that the Government provided to the Court *ex parte*, *in camera* related to the DOJ's recusal of the three principal Detroit U.S. Attorneys. The Government first stated that it would have to get clearance to release that information. Thereafter, the Government stated that DOJ policy prevented disclosure of the information, but that it would submit the information to the Court *ex parte*, *in camera*. It did so, and the court has been informed of the reason for the recusal.

The Government's Motion for Reconsideration now requests that the Court return the recusal information, and further, that the Court not rely upon it in evaluating the Defendants' Motion to Dismiss based on Selective and Vindictive Prosecution. The Court rejects both requests.

This Court recognizes that district judges examine matters *in camera*, and if they find the matter to be privileged, or not relevant, do not disclose the information. The matter, however, becomes part of the record – it does not revert back to the party that submitted it and disappear. The Court will not destroy that part of the record in this case. Further, the Court recognizes that if the information provided is relevant to the Court's ruling, the Court must consider the information in reaching its ruling.

The Court finds that the reason for the recusal of the three principal Detroit U.S. Attorneys relevant to Defendants' ability to muster the argument in support of their claim of selective/vindictive prosecution, and will therefore consider it in arriving at its ruling. The Court is not concluding that this evidence, by itself, establishes a constitutional violation, but rather that it is evidence which Defendants are entitled to discover to argue their claims.

The third matter provided by the Government to the Court *ex parte*, *in camera* relates to the Government's assertion, to undercut Defendant's selective/vindictive prosecution claims, that another Democrat trial lawyer, investigated by the DOJ for federal campaign finance violations, was not prosecuted by the Federal Government for utilizing conduit contributions to the federal 2004 Edwards for President campaign. The Government, while providing the name of the trial attorney to the Court *ex parte*, *in camera*, objected to public release of this individual's name because he was not prosecuted. The Court agrees that it would be improper to publicly set forth the name of a subject of a grand jury investigation who was not prosecuted.

14

**B.     Motions for Reconsideration**

**1.     Defendant's Motion**

Citing *Barnwell*, Defendants contend that *ex parte* communications between the Government and the Court can be tolerated only by a compelling government interest, such as national security, or witness or juror safety, none of which apply here. Accordingly, Defendants request access to all items submitted by the Government to the Court *ex parte*, *in camera*.

The Government contends it made a mistake and should never have provided the information to the Court, and that "the information we have provided *in camera* should be returned to us and not considered by the Court." (Gov't Resp. to Def. Mot. for Recon. at 1).

> Having worked hard to establish the discovery principles in *Bass* and *Thorpe*, we undercut those efforts by providing in this case the very discovery which the case law holds that we need not provide.

(*Id.* at 5). The Government asserts that Defendants have not met their burden of providing preliminary evidence of selective or vindictive prosecution necessary to entitle them to discovery. The Government concludes that it is wasting time responding "to Defendants' baseless claims." (*Id.* at 6). The Government noted that despite Defendants' lack of entitlement to such evidence, it has provided some discovery in response to Defendants' motion:

> We described the relationship between the Public Integrity Section and the United States Attorney's Office. We acknowledged the recusal of some personnel in the Eastern District of Michigan. We provided public record information to the Court concerning other campaign contribution cases, and provided certain additional information to the Court *in camera*. We did all of that in an effort to reassure the Court that defendants' failure to establish a colorable claim of improperly selective prosecution was no mere technical default – the fact is that they are being prosecuted properly.

(*Id.* at 3-4 (emphasis added)).

The Government also notes that providing materials to the Court *ex parte* for *in camera* review, e.g. grand jury materials, does not waive the government's ability to assert confidentiality. The Court concurs. The Court recognizes that this occurs, *inter alia* with regard to claims of grand jury secrecy under Federal Rule of Criminal Procedure 6(e), and in cases where the Court concludes that information submitted *ex parte*, *in camera* is privileged.

As noted before, the Court will not adopt the Government's suggestion and erase from its mind the existence of the evidence. Indeed, the Government acknowledged that the information at issue is relevant to Defendants' claim. But while the Government finds that "the particular information we have provided is only marginally relevant to Defendants' claim," the Court concludes that the information is quite relevant and essential to that claim. (*Id*. at 9).

The Government recognizes that in certain circumstances, the Court would utilize that information: "The only reason the 'judicial bell' could not be 'unrung' would be if, once exposed to information, the Court was unable to disregard that information." (*Id*. at 10). Such is the case here.

In reaching this conclusion to provide discovery of the reason for recusal, the Court has not concluded that the information at issue establishes Defendants' claim of selective or vindictive prosecution – that consideration is for another day.

### 2. Government's Motion for Reconsideration

The Government's Motion for Reconsideration "asks that the Court not require the Government to provide further information" *in camera*, unless Defendant Fieger withdraws his objection to Government *in camera* presentations to the Court. Defendant Fieger has not withdrawn his objection to that concept.

The Government seeks to distinguish *Barnwell* from the instant case:

> *Barnwell* found that *ex parte* communications with a trial court occurred during a "critical stage" of a trial and, therefore, required a compelling state interest. It is an open question, however, whether evidence regarding a claim of selective and vindictive prosecution would qualify as a critical stage of trial. As the Sixth Circuit has recognized, such claims have nothing to do with the merits of the underlying criminal case. *United States v. Abboud*, 438 F.3d 554, 580 (6th Cir. 2006) . . . .

(Gov't Br. at 2, n1).

The instant case is now post-indictment, pre-trial. Defendants have made a claim of selective/vindictive prosecution, which must be decided pre-trial. The Court finds this is a critical stage for a defendant facing trial because if this claim succeeds, there will not be a trial. Indeed, the Government has filed a motion to prevent any mention of selective or vindictive prosecution at trial; Defendants' sole opportunity to address this issue is pre-trial.

The Government's Motion for Reconsideration states that absent Defendant Fieger's objections to its *ex parte*, *in camera* submissions, the Government would have addressed "information concerning Defendants' funding a campaign against Michigan Supreme Court Justice Stephen Markman," at the *in camera* hearing held on November 27, 2007. This did not occur because Defendant has not withdrawn his objections.

At the same time, the Court notes that information about the Government's investigation of the Markman state reelection campaign has already surfaced in these proceedings. The Government has stated, in response to Defendants' assertions that grand jury witnesses claimed they were asked about the Defendant Fieger's financing of an anti-Markman campaign, that "one can assume" that the anti-Markman state campaign financing issue was part of the federal investigation.[6]

---

[6] "[L]et's assume witnesses were asked about Markman campaign money and witnesses were asked how they voted for." (Hearing Trans. 12/14/07, at 29, Helland).

At the hearing held December 14, 2007 on the Motion for Reconsideration, Christopher Yates, co-counsel for Defendant Johnson stated:

> The first reference I found in the materials that we've received in discovery about questions concerning the Steve Markman campaign by Mr. Fieger was on April 13, 2005 when Mr. Humphrey met with government agents. So I believe the recusal occurred in November of 2005.
>
> This FBI 302 indicates that there was discussion of Mr. Fieger's involvement with the Markman matters as early as April 13, 2005.

(Hearing Trans. 12/14/07, at 102-03). In response, AUSA Helland stated:

> With that in the record, frankly I'd forgotten that with that in the record, that establishes an overlap of what we were looking at and what the State was looking at, I believe at least – it puts into the record that it was within our body of knowledge that there might have been involvement with Mr. Markman. It doesn't establish any connection between the state and federal investigation. And I think that's the point.

(*Id*. at 103). Thus, Defendant Fieger's alleged financing of anti-Markman campaign was front and center of the local U.S. Attorney office investigation from its inception, April 13, 2005.

The Government recognizes the possible relevance of the reason for recusal to Defendant's vindictive prosecution claim:

> It is possible to imagine that this information might become relevant to a claim of vindictive prosecution in one narrow circumstance – <u>if</u> defendants had offered credible evidence that we who are prosecuting them were so incensed by their finding of the anti-Markman campaign that we chose to single them out for prosecution on that basis. However, there is no such evidence.

---

The Government's response as to why individuals were asked for whom they voted – an invasive question that goes to the heart of an individual's right to privacy in a democracy – was if the contributor's vote went to a candidate other than Edwards, this supported evidence of an illegal campaign contribution. The Government's rationale for asking that question assumes that individuals always vote for a candidate to whom they contributed, and ignores many possible alternatives, e.g. the person contributes to multiple candidates, the contributor had a change of mind when he got into the voting booth, the contributor gave based on friendship with the solicitor, not commitment to the candidate.

(Gov't Br. at 5) (emphasis in original).  The Court disagrees with the Government's conclusion as to Defendants' evidence at this stage of the proceedings.  The Court must decide whether there is evidence, including the *ex parte* submissions, sufficient to proceed further on Defendant's instant discovery request – specifically whether to order the Government to provide Defendants with the reason for the recusal.

The Court notes, and the Government has recognized, that the focus of Defendants' claim has become vindictive prosecution.  To establish a claim of vindictive prosecution, must show:

1. a prosecutional stake in the exercise of a protected right

2. unreasonableness of the prosecutor's conduct, and

3. an intent to punish Defendant for exercise of the protected right.

*United States v. Suarez*, 263 F.3d 468, 479 (6th Cir. 2001).  Further,

> [t]here are two approaches to showing prosecutorial vindictiveness: a defendant can show (1) actual vindictiveness, by producing objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights, or (2) a realistic <u>likelihood of vindictiveness</u>, by utilizing the framework outlined above (focusing on the prosecutor's stake in deterring the exercise of a protected right and the unreasonableness of his actions).  Attempting to show actual vindictiveness has been characterized as exceedingly difficult and an onerous burden.

*United States v. Dupree*, 323 F.3d 480, 489 (6th Cir. 2003) (internal quotations and citations omitted) (emphasis added).

The Court having viewed the evidence submitted by the Government *in camera*, the briefing, and the oral argument, concludes that there is presently sufficient evidence to support Defendants' vindictive prosecution allegation to entitle them to the instant initial discovery matter – the reason for recusal – in pursuing their claim.

The issue before the Court today is whether Defendants are entitled to discovery of the reason for the recusal. Thereafter, Defendants can utilize that information in their argument to the Court.

The Court questioned the Government regarding the recusal:

Q. <u>Court</u>:       Did the U.S. Attorney, Mr. Murphy, give a reason when he recused himself on this case?

A. <u>Mr. Helland</u>:  There is a reason. At this point, I'm trying to get clearance to disclose that reason, but I'm not allowed to do it yet. It won't come from him. There's the office that does the recusing, the Executive Office of United States Attorneys and they're the ones that have to decide this. So if they did write something up and that something, they have to decide whether or not I can disclose it or its contents and they haven't authorized that.

(Hearing Trans. 10/16/07, at 90-91). On October 23, 2007, Detroit AUSA Helland sent a letter to the Court setting forth the Government's position on the recusal issue:

I have been advised by the Executive Office for United States Attorneys that the policy of that office is not to discuss publicly the reasons for any recusal action. However, they have also advised that I am authorized to disclose those reasons to you *ex parte* and *in camera*. If that is acceptable to the Court, I am prepared to do so.

In response, the Court issued its Interim Order accepting the Government offer, and the information was provided to the Court *ex parte*, *in camera*. Now Defendants seek that information.

Is there a legal basis to deny Defendant's request for discovery of the reason for the recusal?

Initially, the Court finds that the DOJ policy of not revealing that issue publicly, is not a legal basis for the Court to foreclose disclosure of the reason for the recusals to Defendants.

The Government brief relies on three separate grounds to support secrecy: Fed. R. Crim. P. Rule 16, the deliberative process privilege, and the attorney client privilege, all of which are discussed, *infra*.

### 3. Fed. R. Crim. P. Rule 16 and Privileges

The Government filed a brief, apart from its November 26, 2007 Motion for Reconsideration, filed on December 7, 2007: "United States' Brief Concerning Privileged Nature of Recusal Information," which sets forth three separate theories in support of its argument that it need not provide Defendants with the recusal reason: (1) F.R. Crim. P. 16, (2) the Deliberative Process Privilege, and (3) the Attorney Client Privilege.

The Court concludes that none of these three grounds protects the <u>reason</u> for recusal from discovery by the Defendants. The Court is not requiring the Government to turn over the recusal memoranda/documents – just to explain in a single sentence the reason for the recusal, e.g., "The DOJ ordered the recusal of the three top Detroit U.S. Attorney Office principals because they (did what)."

### a. Fed. Rule Crim. P. 16(a)(2): Discovery and Inspection

The Government contends that the recusal memoranda is not subject to discovery insofar as it is protected under Rule 16(a)(2), which states:

> Except as Rule 16(a)(1) provides otherwise, this rule does not authorize the discovery or inspections of reports, memoranda or other internal government documents made by an attorney for the government . . . in connection with investigating or prosecuting the case."

Defendant is not basing his claim for discovery under Rule 16 which deals with trial discovery and trial preparation of the defense at trial. Instead, Defendant is seeking discovery for his pretrial constitutional due process claim which is not cabined by Rule 16.

The Supreme Court recognized in *United States v. Armstrong*, 517 U.S. 456, 462-63 (1996), that a selective prosecution claim cannot be construed as a defense:

> [I]n the context of Rule 16 "the defendant's defense" means the defendant's response to the Government's case in chief . . . . A selective prosecution claim is not a defense on the merits to a criminal charge itself, but a independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution.

*Id*. at 463. The Supreme Court further noted that "[o]f course, a prosecutor's discretion is 'subject to constitutional constraints'". *Id*. at 464.

A similar constitutional due process constraint applies with regard to a vindictive prosecution claim, as the Supreme Court recognized in *Blackledge v. Perry*, 94 S.Ct. 2098, 2101 (1974). Thus, Rule 16 does not control Defendant's request.

### b. Deliberative Process Privilege

In *Department of the Interior v. Klamath Water Users Protective Assoc.*, 532 U.S. 1, (2001), the Supreme Court stated:

> The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance "the quality of agency decisions . . . by protected open and frank discussion among those who make them within the Government . . . .

*Id*. at 8-9.

The discovery ordered by the Court in the instant Order requires only that the Government provide the reason for the recusal. The Court does not require the Government to divulge any communication the three local U.S. Attorneys sent to the DOJ, or any DOJ communications in

22

response; just the specific reason for recusal. Thus, the instant discovery order does not reveal any candid communications between any officials or any "deliberative process." Accordingly, the deliberative process privilege does not apply.

In *Rugiero v. United States Department of Justice*, 257 F.3d 534, 550 (6th Cir. 2001), Sixth Circuit Court of Appeals Judge Alice Batchelder explained the deliberative process privilege:

> To come within this exception on the basis of the deliberative process privilege, a document must be both "predecisional", meaning it is "received by the decisionmaker on the subject of the decision prior to the time the decision is make," and "deliberative", the result of the consultative process . . . . [T]he key issue in applying this exception is whether disclosure of the materials would "expose an agency's decisionmaking process in such a way as to discourage discussion within the agency and thereby undermine the agency's ability to perform its functions.

(citations omitted). Again, in the instant case, this Court orders only the reason for the recusal – not papers relating to the process. Thus, disclosure of the reason does not expose the DOJ's decisionmaking process so as to discourage discussion within the agency and undermine its ability to perform its functions.

The Seventh Circuit noted in *United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993), that even if the deliberative process privilege was applicable to the reason for the recusal, that

> privilege may be overcome when there is a sufficient showing of a particularized need outweigh the reasons for confidentiality. C.F. *Costal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980) (the privilege should be applied "as narrowly as consistent with efficient government operation.")

The deliberative process is overcome – the privilege is routinely denied – "where there is reason to believe the documents sought may shed light on government misconduct. . . ." *Hinckley v. U.S.*, 140 F.3d 277, 285 (D.C. Cir. 1998), citing *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997).

In the instant case, the Court is not concluding that there has been governmental misconduct. However, the Court does conclude that the information at issue – the reason for the November

recusal – is essential to permit the Defendants to argue their claim, of Government misconduct. This information – the reason for the recusal – is not otherwise available to the Defendants.

The Court, in balancing the Defendants' critical need for this information in pursuing their claim of vindictive prosecution, against the effect of the disclosure on the government, concludes that this minimal disclosure is required.

The Court has had the benefit of being provided the reason for recusal by the Government *ex parte*, *in camera*, and the Court concludes that providing this information to the Defendants will not interfere with future open and frank discussion within the DOJ. This Order will not stop United States Attorneys from being open and candid, and honoring their obligations to the legal profession's Canons of Ethics or to DOJ Rules/Standards, to recuse themselves on their own, or through the DOJ process, when circumstances so require.

The Court does not accept the Government's suggestion (Government's Brief Concerning Privileged Nature of Recusal Information at 5) that the possibility of disclosure of the reason "would create a significant disincentive for Department of Justice employees to be candid concerning potential conflicts of interest, substituting an incentive to shade the facts created by the possibility of public disclosure." (emphasis added).

This Court does not for a moment believe that the thousands of outstanding attorneys within the Department of Justice would "shade the facts" when critical issues of professional responsibility arise. For the local Assistant United States Attorney, and no less than an attorney in the Public Integrity Section of the Justice Department, to suggest that the Court's ordering discovery of this limited reason for the recusal, will result in shady practices by Department of Justice attorneys, does not honor and respect the tradition and good name of the United States Department of Justice.

### c.    The Attorney-Client Privilege

The Government also raises the attorney-client privilege concerning the recusal information submitted to the Court *in camera*.  Specifically, the Government references:

> The information that is contained in the memorandum we provided the Court which describes the events leading up to that final decision, concerns discussions between the United States Attorneys' Office for the Eastern District of Michigan and one of two entities in the Department of Justice – either the Professional Responsibility Office or the Executive Office for United States Attorneys.

(Gov't Br. at 7).  Again, the Court reiterates that it is not ordering the Government to provide any discussions, or the memorandum provided to the Court, but merely the reason for the November recusal decision.

The Government recognizes that the final decision to recuse is not legal advice, but asserts that all other information in the recusal information is covered by the privilege.  (Gov't Br. at 8 n. 4).  Again, the Court reiterates that it is not requiring release of the memorandum, or the reasoning, just the specific conduct of the three that resulted in the recusal in November, 2005.  As the Court is not requiring the Government to disclose the discussions or the memoranda, the attorney-client privilege is not applicable.

### C.    Vindictive Prosecution

The Sixth Circuit relied upon the discussion of vindicate prosecution *Blackledge* in *United States v. Adams*, 870 F.2d 1140, 1141 (6thCir. 1989), where it held, "[T]his is one of those rare cases where the defendants are entitled to discovery on the issue of whether the government's decision to prosecute was tainted by improper motivation."

Judge David Nelson's opinion discussed the constitutional underpinning for a claim of vindictive prosecution:

> [A] prosecution which would not have been <u>initiated</u> but for governmental "vindictiveness" – a prosecution that is, which has an "actual retaliatory motivation" – is constitutionally impermissible. *Blackledge v. Perry*, 94 S.Ct. 2098, 2102 (1974).

*Id*. at 1145 (emphasis added). Judge Nelson's opinion further discussed the defendant's claim:

> "Some evidence" of vindictive prosecution has been presented here. It is hard to see, indeed, how the defendants could have gone much farther than they did without the benefit of discovery on the process through which this prosecution was initiated. It may well be that no fire will be discovered under all the smoke, but there is enough smoke here, in our view, to warrant the unusual step of letting the defendants find out how this unusual prosecution came about. It will be time enough for the district court to consider whether an evidentiary hearing should be held after discovery has been completed – and we are confident that the district court will not let the discovery get out of hand.

*Id*. at 1146.

This Court recognizes the parameters set forth in Judge Nelson's opinion and finds that "some evidence" of vindictive prosecution is present here where the local U.S. Attorney's office failed to follow the DOJ Manual. Further, <u>at the time period when the federal search warrant was executed at the Fieger law offices in late November, 2005</u>, there was, <u>at a minimum, scheduling</u> coordination <u>between</u> the state investigation of Defendant Fieger and the federal investigation of state election contributions by Fieger. Add to this, from Defendant's point of view, the use of over 75 agents engaging in a nighttime search of Defendants' law office, and the <u>agents'</u> home <u>visits</u> of 32 Edwards contributors tied to Defendant Fieger, the threat to prosecute the contributors, and the Government's inquiry into whom the individual contributors voted. Therefore, as in *Adams*, Defendants cannot proceed further in presenting argument and evidence without the benefit of their discovering the reason for the recusal.

Also, as in *Adams*, after the reason is provided to the Defendants, the Court will not allow broad, sweeping discovery but the next proceeding will be to have argument on Defendant's Motion for Discovery.

The present case lacks the traditional hallmarks of a claim for prosecutorial vindictiveness – namely the substitution or increase in the charges brought by a prosecutor after a defendant has asserted a right. However, Defendants' claim relates to the prosecutor's initial decision to investigate, and then additional factors on the road to the indictment. The gravamen of Defendants' vindictive prosecution argument is that Defendant Fieger was targeted for prosecution because of his exercise of protected First Amendment rights. *See* LITMAN, PRETEXTUAL PROSECUTION, 92 GEORGETOWN L.J. 1135, 1142 (2004).

Defendants assert that the individual prosecutors, local and national, have a "stake' in the exercise of Defendant Fieger's protected First Amendment rights. The reason for the recusal is relevant to Defendants' ability to present that argument to the Court.

Defendants have established evidence that in initiating the investigation in this case, the Detroit U.S. Attorney's office acted in violation of DOJ policy, did not recuse the top three prosecutors instantly, but allowed seven months to elapse before asking the DOJ to determine whether they should be recused. The DOJ's answer was yes. These facts support Defendants' claim for discovery of the reason for the recusal of the top three officials in the Detroit U.S. Attorney's office.

## III. CONCLUSION

This first ever campaign finance prosecution by the Detroit U.S. Attorney's office is unique both in subject matter, and its failure to follow <u>mandatory</u> DOJ Manual procedures that prohibit a

local U.S. Attorney from proceeding with <u>any</u> such campaign finance investigation without prior consultation with the DOJ's Public Integrity Section. The Public Integrity Section was not consulted by the Detroit office prior to, or apparently even early on in the investigation.[7]

The Government concedes that the overwhelming majority of election campaign finance violations proceed first to the FEC. (Hearing Trans. 10/16/07, at 102-03, Helland). The failure of the local U.S. Attorney's office to consult immediately with the DOJ Public Integrity Section prevented the DOJ from initially consulting with the FEC. Manual, at 18; Hearing Trans. 11/7/07, at 125, Day. Indeed, it was the Defendant Fieger who first consulted with the FEC. It was only after Defendant Fieger's attorney Thomas Cramner sent a letter to the FEC about the instant federal criminal investigation that the FEC opened a case. Thereafter, the prosecutors convinced the FEC

---

[7] At the hearing on November 7, 2007, the following exchange occurred:

| Helland: | I did not consult with Washington . . . . I assigned [AUSA Chris Varner] in my office to work on it for a period of time. . . . Roughly simultaneously, the case also went to the Public Integrity Section. |
| Court: | . . . . It went to Washington but you didn't consult? |
| Helland: | No. |
| . . . . | |
| Court: | When was your first conversation with [Public Integrity Attorneys] Mr. Day or Hillman whoever was there? |
| Helland: | Boy, I'm not going to be able to remember when I first spoke with Mr. Day, <u>it was substantially after that</u>. |
| . . . . | |
| Helland: | Mr. Varner, probably, <u>I would hope</u>, had contact with Public Integrity, but I did not. |
| Court: | But you can find out because there will be a trail list of whatever he did. |

(Hearing Trans. 11/7/07, at 111-14) (emphasis added). No information of any contacts between AUSA Varner and the Public Integrity were subsequently provided to the Court.

not to proceed with a parallel civil investigation of this case: "the FEC came to us and we agreed that they would not pursue their investigation."[8]  (Hearing Trans. 11/7/07, at 125, Day).

The belated recusal from this case by the DOJ of the three principal executives in the Detroit U.S. Attorney's office after the investigation had been ongoing for seven months provides additional facts, that, combined with that office's violations of the DOJ Manual's mandatory strictures, meet the "some evidence" threshold to permit Defendants to seek discovery to pursue their claim of prosecutorial vindictiveness.  This supports the Court's order that the reason for the recusal be provided to the Defendants to allow them to argue their vindictive prosecution claim.[9]

The Government's refusal to provide Defendants with a redacted list of other E.D. MI cases that utilized a large complement of federal agents, is based solely on its argument that Defendants have not met the threshold necessary to entitle them to any discovery.  The Court has concluded that Defendants have met that threshold.  Accordingly, the Court orders that the Government provide Defendants with that redacted list within seven days.

The Court, therefore, **DENIES** the Government's Motion for Reconsideration, and **GRANTS IN PART AND DENIES IN PART** Defendant's for Reconsideration.

---

[8] Three 527 Groups (two Republican, one Democrat) that raised and illegally spent millions of dollars in federal election campaigns were not criminally prosecuted.  All three cases were resolved civilly by the FEC through the payment of civil fines.  According to Defendant's counsel, Veterans and POWs for Truth raised and spent more than 25 million in the 2004 presidential campaign; Progress for American Voters Fund raised more than 44 million in the same election.  (Hearing Trans. 10/16/07, at 23, Cranmer).  None of the three 527 Groups were "referred for criminal prosecution by the FEC."  (*Id*. at 53, Helland).

[9] The Court recognizes that both the local Detroit U.S. Attorney's office and the DOJ Public Integrity Section signed the indictment.  The dual signatures do not eliminate the fact that the investigation was initiated, and initially carried forward by the Detroit office.  Further, the Public Integrity Section and the local Detroit U.S. Attorney's office are both arms of the same entity and do not constitute two independent prosecutions.

The Court **ORDERS** that the Government provide the reason for the U.S. Attorney recusals to Defendants with seven (7) days of this Order.

Further, the Court **ORDERS** the Government provide the redacted list of other E.D. MI cases within seven (7) days of this Order.  The Court is not now ruling on Defendant's claim of selective and vindictive prosecution.

**SO ORDERED.**


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  February 1, 2008

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on February 1, 2008.


s/Denise Goodine
Case Manager