# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

    Case No. 07-20414
    Hon. Paul D. Borman
    Hon. Gerald E. Rosen

GEOFFREY FIEGER,

    Defendant.
_____/

## OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO DISMISS FOR VIOLATIONS OF JURY SELECTION AND SERVICE ACT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on    April 29, 2008

PRESENT: Honorable Gerald E. Rosen
                Acting Chief United States District Judge

## I. INTRODUCTION

Through the present motion, filed on April 11, 2008, Defendant Geoffrey Fieger requests the production of various records bearing upon the processes used to select grand and petit jurors in his case, as well as additional materials relating more broadly to the juror selection process generally employed in this District. Defendant contends that this information is essential to his determination whether to pursue a challenge to the jury selection process in this case under the Jury Selection and Service Act ("JSSA"), 28

U.S.C. § 1861 *et seq.,* or under the equal protection guarantee of the Fifth Amendment.[1]

Pursuant to Administrative Order No. 00-AO-060 of this District, to the extent that a party seeks juror selection materials beyond the information contemplated in this order — *i.e.,* juror number, race, and Hispanic ethnicity — such a motion is referred to the Chief Judge for a "case-by-case" determination whether the movant has shown "good cause" for the requested materials. Because Defendant's motion seeks such additional disclosures, it has been referred for a determination by this Court in its role as acting Chief Judge. Having reviewed the parties' briefs and accompanying exhibits, the Court finds that the relevant facts and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendant's motion "on the briefs." See Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings on this motion.

## II. **BACKGROUND**

Under the juror selection plan adopted by the Judges of this District in 2000 and

---

[1]Although Defendant's motion is captioned as a motion to dismiss and requests at the outset that the Court dismiss the charges against him, it is clear from the accompanying plea for relief, and further confirmed in Defendant's reply brief in support of his motion, that Defendant's present objective is to secure information that he views as necessary to establish that there were statutory and constitutional infirmities in the juror selection process. This information, in turn, would then be marshaled in support of a motion to dismiss. Consequently, this Court views its inquiry as limited to Defendant's request for juror selection information and records, as opposed to the merits of any JSSA or constitutional challenges he might subsequently elect to pursue. Nonetheless, and as discussed below, the substantive law governing such challenges has some bearing upon the Court's disposition of the present motion.

subsequently approved by the Judicial Council of the Sixth Circuit, potential jurors are drawn from a "master jury wheel" in which "each county within a division is proportionally represented." See Administrative Order No. 00-AO-083, Juror Selection Plan § (h)(2); see generally United States v. O'Reilly, No. 05-80025, 2008 WL 115537, at *2-*3 (E.D. Mich. Jan. 10, 2008) (Friedman, C.J.) (describing this District's current juror selection plan). The exact percentages of this mandated "proportional representation," in turn, are determined by reference to the numbers of registered voters in each county within the division. Upon applying this formula to the current master jury wheel for the Detroit division, which was created in the fall of 2006, it was determined that Wayne County residents were to comprise 39.62 percent of the master wheel, or 39,620 of the 100,000 names on this wheel. See Administrative Order No. 06-AO-005.

Defendant's motion rests principally upon a 14.89 percent disparity between the court-mandated 39.62-percent representation of Wayne County residents in the master jury wheel and the smaller representation (24.73 percent) of Wayne County residents in the pool from which petit jurors are being selected for Defendant's trial.[2] Specifically, out of the 186 people who completed the detailed questionnaires given to potential jurors in this case,[3] 46 of these individuals, or 24.73 percent of the overall pool of 186, reside in

---

[2] As explained by this Court in United States v. Greene, 971 F. Supp. 1117, 1127 & n.11 (E.D. Mich. 1997), this difference of 14.89 between the percentage of Wayne County residents in the pool of potential jurors (24.73) and the percentage of Wayne County residents in the master jury wheel (39.62) is referred to as an "absolute disparity."

[3] As the Government notes in its response to Defendant's motion, the Clerk's Office evidently issued 250 summonses to prospective jurors, directing them to appear and fill out these

3

Wayne County. If the county-by-county representation in this particular pool of 186 individuals had precisely matched the composition of the master wheel, between 73 and 74 of these individuals would have been Wayne County residents. According to the statistical analysis discussed and applied by this Court in Greene, 971 F. Supp. at 1125, as well as by the Supreme Court in Castaneda v. Partida, 430 U.S. 482, 496 n.17, 97 S. Ct. 1272, 1281 n.17 (1977), and by the Sixth Circuit in Jefferson v. Morgan, 962 F.2d 1185, 1190 (6th Cir. 1992), the disparity here of 27 or 28 between the expected (73 or 74) and actual (46) Wayne County residents in the pool of 186 potential jurors reflects a difference of just over four standard deviations.[4]

Apart from this disparity based upon county of residence, Defendant also contends that African Americans are under-represented in the pool of 186 individuals from which a petit jury is being selected in this case. In support of this assertion, Defendant points to census data indicating that African Americans comprise 22 percent of the population of the nine-county region from which jurors are selected in the Detroit division of this

---

case-specific questionnaires. Some of these individuals failed to appear as instructed, while others were excused from appearing for various reasons. There is no information in the record regarding the county of residence or race of the 64 people to whom summonses were issued but who did not fill out questionnaires.

[4]Although Defendant asserts in his motion that the 14.89 percent absolute disparity in this case is "far too great to be explained by statistical happenstance," (Defendant's Motion, Br. in Support at ¶ 9), he offers no statistical analysis whatsoever in support of this contention. For its part, the Government asserts that Defendant's numerical analysis of a small sample of 186 potential jurors from a master wheel of 100,000 is "statistically insignificant," (Gov't Response at 5), but it, too, provides no statistical basis for this claim. Rather, the Court has been left to its own devices in analyzing the statistical significance of the disparities in the composition of the pool of 186 potential jurors in this case.

District. In contrast, there are only 18 African Americans in the pool of 186 individuals from whom the parties are selecting a jury in this case.

Again, Defendant contends that the absolute disparity between the roughly 10-percent African American representation in the pool of potential jurors and the 22-percent African American population of the nine-county Detroit area is "far too great to be explained by statistical happenstance." (Defendant's Motion, Br. in Support at ¶ 9.)[5] He further suggests that this disparity is a byproduct of the under-representation of Wayne County residents in the pool of 186 potential jurors, where Wayne County's population is 41.8 percent African American, while the remaining counties from which jurors are drawn in the Detroit division have African American populations ranging from 0.4 to 12.5 percent.

Based upon these disparities, Defendant seeks an order directing the Clerk of the Court to produce additional records bearing upon this District's process for juror selection, beyond the materials that are ordinarily available under Administrative Order No. 00-AO-060, under §§ (s)(2) and (s)(3) of this District's juror selection plan, and under 28 U.S.C. § 1868. In particular, Defendant requests the disclosure of (i) "all records and documents revealing the composition of the master jury wheel," and (ii) "any and all records, including the summonses sent to prospective jurors, for the last fifteen

---

[5]Once again, neither party has provided any statistical analysis of this disparity. Applying the analytical tools used in Greene, however, it appears that the disparity here between the expected (40) and actual (18) African Americans in the pool of 186 potential jurors reflects a difference of just under four standard deviations.

(15) venires drawn by the Clerk," along with information "as to the county of residence of each prospective juror within each of the 15 venires." (Defendant's Motion at 1.) Defendant also seeks the disclosure of "the residency of those individuals who served on the grand jury in this matter," (id.), under the premise that the grand jurors were drawn from the same master wheel that produced the pool of 186 potential petit jurors,[6] with its purported under-representation of both Wayne County residents and African Americans.

### III. ANALYSIS

A.  **The Standards Governing Defendant's Motion**

To the extent that a party seeks more detailed information and records regarding this District's process for juror selection, and not merely the disclosure of juror number, race, and Hispanic ethnicity, Administrative Order No. 00-AO-060 provides that such requests will be reviewed on a "case-by-case basis," and will be granted upon a showing of "good cause." As explained by former Chief Judge Zatkoff, a party may establish the requisite "good cause" by showing that the requested information is necessary to prepare and present a motion challenging the jury selection process. United States v. Montini, No. 03-80228, 2003 WL 22283892, at *3 (E.D. Mich. Sept. 3, 2002); see also O'Reilly, 2008 WL 115537, at *3 (Friedman, C.J.). Accordingly, to establish his entitlement to the

---

[6]It appears that Defendant's premise is incorrect. According to Administrative Order No. 06-AO-005, the previous master jury wheel for the Detroit division expired on September 30, 2006, and was then replaced by the current wheel. The grand jury investigation that led to the indictment in this case pre-dated the creation of the current master jury wheel. Under 28 U.S.C. § 1868, the records pertaining to the previous master jury wheel for the Detroit division are available for public inspection.

6

information sought through the present motion, Defendant must show that these materials will assist him in proving either a violation of the Jury Selection and Service Act ("JSSA"), 28 U.S.C. § 1861 *et seq.*, or an equal protection violation.[7]

**B.     Defendant Has Not Shown a Need for Information Beyond That Which Is Ordinarily Available in Order to Determine Whether the Jury Selection Process in His Case Violated the JSSA or His Sixth Amendment Right to an Impartial Jury.**

As this Court previously has explained, "[t]he Sixth Amendment guarantee of an 'impartial jury' has been construed as encompassing the right to a jury drawn from a fair cross section of the community." United States v. Brown, 128 F. Supp.2d 1034, 1038 (E.D. Mich. 2000) (internal quotation marks and citations omitted). Likewise, the JSSA articulates a "policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861.

A claim that jury selection violates the "fair cross section" requirements of the

---

[7]To be sure, Defendant claims a broader entitlement to these materials, citing Sixth Circuit case law for the proposition that the JSSA "grants him an 'unqualified right' to inspect such information." (Defendant's Reply Br. at 2 (citing United States v. McLernon, 746 F.2d 1098, 1122 (6th Cir. 1984)).) Yet, McLernon goes on to explain that "[t]he right to inspection extends to all jury selection materials relevant to a complete determination of whether a grand or petit jury has in fact been selected at . . . random from a fair cross-section of the community." McLernon, 746 F.2d at 1023 (internal quotation marks and citations omitted). Thus, when confronted with similar claims of an "unqualified right" to inspect juror selection materials, Chief Judges Friedman and Zatkoff both have concluded that this right "encompasses only such data as [a defendant] needs to challenge the jury selection process." O'Reilly, 2008 WL 115537, at *3-*4; see also United States v. Jones, No. 01-80571, slip op. at 15-17 (E.D. Mich. May 14, 2004) (Zatkoff, C.J.).

7

Sixth Amendment and the JSSA can be proven through direct or indirect evidence. See United States v. Ovalle, 136 F.3d 1092, 1099 (6th Cir. 1998); see also Brown, 128 F. Supp.2d at 1039. Where, as here, there is no direct evidence that the jury selection process used in this District invariably leads to the under-representation of the two groups identified by Defendant, Wayne County residents and African Americans, Defendant must rely upon indirect evidence to sustain his claim. Defendant's initial burden is to establish the three elements of a *prima facie* showing of a "fair cross section" violation: "(1) that a 'distinctive group' is being excluded from the jury pool; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in comparison to the group's representation in the community at large; and (3) that this disparity is attributable to systematic exclusion of the group in the jury selection process." Brown, 128 F. Supp.2d at 1039 (citations omitted).

As a threshold matter, it is far from clear that one of the groups identified in Defendant's motion — Wayne County residents — qualifies as a "distinctive group" whose exclusion from a jury pool could establish the first prong of a *prima facie* case under the Sixth Amendment and the JSSA. Although the Sixth Circuit has not spoken on this issue, a district court within this Circuit thoroughly surveyed the relevant case law and found that it uniformly holds "that residents of a geographic area are not a distinct, cognizable group based on their place of residence alone." United States v. Traficant, 209 F. Supp.2d 764, 780 (N.D. Ohio 2002); see also United States v. Butera, 420 F.2d

564, 572 (1st Cir. 1970) (holding that residents of a particular county do not qualify as a "distinctive group" for purposes of a fair cross section analysis), overruled on other grounds, Barber v. Ponte, 772 F.2d 982, 998 (1st Cir. 1985). Rather, place of residence is relevant to a fair cross section analysis only to the extent that it serves as a "proxy for another, recognized distinct group." Traficant, 209 F. Supp.2d at 782.

For present purposes, it is unnecessary to decide whether, and to what extent, Defendant may pursue a fair cross section challenge based upon the purported under-representation of Wayne County residents in his or other pools of potential jurors formed pursuant to this District's juror selection plan. Defendant's motion does not rest solely on this ground, but also cites African Americans as a distinctive group that is under-represented in the pool of 186 individuals from which a jury is being selected in this case. It is clear that African Americans qualify as a "distinctive group" whose alleged exclusion from a jury pool would satisfy the first prong of a *prima facie* case. See Brown, 128 F. Supp.2d at 1040. Moreover, Defendant has provided at least some evidence that Wayne County residence is a proxy for race, where the census figures accompanying his motion reveal that the County's residents are 41.8 percent African American, while the remaining eight counties from which potential jurors are drawn for the Detroit division have African American populations of 12.5 percent or less. Thus, a substantial under-representation of Wayne County residents is likely to result in an under-representation of African Americans as well.

Accordingly, the Court proceeds to the remaining two prongs of a *prima facie* showing of a fair cross section violation. To satisfy the second element of his *prima facie* case, Defendant must show that the representation of Wayne County residents or African Americans in venires from which juries are selected in this District is not "fair and reasonable" in comparison to the representation of these groups in the community at large. See Brown, 128 F. Supp.2d at 1039. Under the third prong of this standard, Defendant must show that any such disparity in the representation of Wayne County residents or African Americans is "attributable to systematic exclusion of the group in the jury selection process." Brown, 128 F. Supp.2d at 1039.

At present, Defendant's showing on these points rests solely on the numerical disparities between the percentages of Wayne County residents and African Americans in the pool of prospective jurors in his case and the percentages of these groups in the overall population of the nine-county region from which the Detroit division draws potential jurors. Specifically, Defendant points to: (i) a 14.89 percent absolute disparity between the percentage of Wayne County residents (39.62 percent) on the Detroit division's current master jury wheel and the percentage of Wayne County residents (24.73 percent) in the pool of 186 potential jurors from which the petit jury for his trial is being selected; and (ii) an 11.9 percent absolute disparity between the 9.7-percent African American representation in the pool of 186 potential jurors and the 21.6-percent African American population of the nine-county Detroit metropolitan area. Defendant

10

contends that, at a minimum, these variances provide a sufficient basis for ordering the disclosure of additional information bearing upon this District's juror selection process, so that he can endeavor to show that the disparities here are part of a broader, systematic failure to provide pools of potential jurors that reflect a fair cross section of the local community.

In response, the Government points to a number of flaws and limitations in the figures and statistics marshaled in support of Defendant's motion. First, the Government correctly observes that there is no information whatsoever in the record as to the county of residence or race of the 64 individuals, out of the overall pool of 250 prospective jurors, to whom summonses were issued but who did not fill out questionnaires. Plainly, these individuals, depending upon their race or place of residence, could minimize or altogether eliminate any claim of under-representation of African Americans or Wayne County residents in the pool of prospective jurors that was drawn for this case under this District's juror selection plan. See Greene, 971 F. Supp. at 1129 (noting that the figures provided in that case "fail[ed] to take into account . . . those people who fail[ed] to show up for jury duty").

More generally, the Government suggests that no meaningful conclusions can be drawn from a sample size of 186 that constitutes less than 0.2 percent of the master jury wheel of 100,000. As the Government points out, this Court has held that "statistics concerning only one actual jury venire and one pool of summoned jurors is patently

11

insufficient evidence to establish systematic under-representation." Greene, 971 F. Supp. at 1128; see also Ford v. Seabold, 841 F.2d 677, 685 (6th Cir. 1988) (observing, in rejecting a fair cross section challenge, that "the alleged claim of underrepresentation in this case is supported only by the results of two samples"). In any event, the Government argues that the absolute disparities identified by Defendant here —14.89 percent as to Wayne County residents, and 11.9 percent as to African Americans — are too small to establish that the representation of these groups in the pool of 186 potential jurors is not "fair and reasonable." See Greene, 971 F. Supp. at 1128 (citing cases holding that absolute disparities between 2.0 and 21.7 percent did not constitute substantial under-representation that would satisfy the second prong of a *prima facie* case).[8]

Although the figures produced by Defendant to date may well suffer from the infirmities identified by the Government, the Court finds that such statistical shortcomings are not dispositive of the narrow issue presently under consideration. In particular, the question at the present juncture is not whether Defendant has made a *prima facie* showing of a fair cross section violation, but whether the additional information he seeks would aid him in establishing the elements of such a showing. More specifically,

---

[8]The Government further asserts that Defendant's claim of an 11.9 percent absolute disparity in African American representation in the pool of 186 potential jurors rests upon an inappropriate comparison with the African American population as a whole in the nine-county Detroit metropolitan area, as opposed to the subset of the African American population that is eligible for jury service. See United States v. Forest, 355 F.3d 942, 954 (6th Cir. 2004); see also Greene, 971 F. Supp. at 1127 n.11 (defining absolute disparity as "the difference between the percentage of a certain population group eligible for jury duty and the percentage of that group who actually appear in the venire").

12

the Court must consider the prospect that the requested materials will enable Defendant to overcome the deficiencies in his present showing.

The Court finds that at least some of the information sought by Defendant could serve this purpose. First and foremost, to the extent that Defendant's motion is construed as seeking further information about the entire pool of 250 potential jurors who were invited to complete detailed questionnaires in this case, this information promises to address one of the principal defects the Government has identified in the present record — namely, that an analysis limited to the 186 individuals who actually completed the questionnaires fails to account for the possibility that the full pool of 250 potential jurors derived through this District's juror selection process might have been more representative of the Detroit metropolitan community at large. Similarly, Defendant's request for information about the most recent 15 venires drawn under this District's juror selection plan would allow him to answer the Government's assertion that a fair cross section claim generally cannot rest upon "statistics concerning only one actual jury venire and one pool of summoned jurors." Greene, 971 F. Supp. at 1128. While Defendant's present showing might fail in one or more respects to satisfy the elements of a *prima facie* case of a fair cross section violation, the Court is unwilling to flatly rule out the possibility that Defendant might establish these elements under a more complete record.

Nonetheless, the Court finds that the information produced for the pool of 250 potential jurors in this case and the last 15 venires should be limited to the data that is

13

presumptively available to parties under Administrative Order No. 00-AO-060 of this District — namely, juror number, race, and Hispanic ethnicity. While Defendant also seeks the disclosure of the county of residence for each prospective juror in each of these pools, the Court already has observed that place of residence is relevant to a fair cross section analysis only to the extent that it serves as a "proxy for another, recognized distinct group." Traficant, 209 F. Supp.2d at 782. It is clear from Defendant's motion that he views the purported under-representation of Wayne County residents in the pool of prospective jurors in his case as a proxy for the claimed under-representation of African Americans in this jury pool. (See, e.g., Defendant's Motion, Br. in Support at ¶ 10 (opining that "the representation of Wayne County with its 41.8% African American community is substantially and markedly diluted while other counties with minimal African American populations are over represented in the jury pool").) Because the production of information regarding the race of prospective jurors allows Defendant to explore the possible under-representation of African Americans directly, there is no need to do so indirectly through the proxy of place of residence. Moreover, Defendant has utterly failed to explain why it is necessary to produce "any and all records" for the pool of 250 potential jurors in this case and the last 15 venires drawn by the Clerk, where identification of the race and Hispanic ethnicity of the members of these pools will be sufficient to enable Defendant to ascertain whether he can establish the fair cross section violation posited in his motion.

Neither has Defendant identified any reason whatsoever for the Court to order the production of "all records and documents revealing the composition of the master jury wheel" for the Detroit division.  To the extent that Defendant's motion rests upon the purported under-representation of Wayne County residents in the pool of potential jurors in his case, the composition of the master wheel plainly had no role in any such shortfall, as the Clerk of the Court was expressly instructed to ensure that Wayne County residents comprised precisely 39.62 percent of this wheel.  Defendant has not suggested any basis for believing that the Clerk might have failed to comply with this directive.  Moreover, because the names in the master wheel are randomly selected from neutral lists of registered voters, licensed drivers, and individuals who have been issued state identification cards, there is no reason to believe that this wheel might be the source of any systematic under-representation of a particular group in this District's jury pools. See Jones, No. 01-80571, slip op. at 19-20 (recounting the steps taken to ensure that this District's jury wheels reflect "as fair of a cross-section of the community as possible, without violating the JSSA or the Constitution").  Finally, it bears emphasis that, as noted earlier, this District's juror selection plan "has been approved by the Judicial Council of the Sixth Circuit." O'Reilly, 2008 WL 115537, at *2.  Under these circumstances, Defendant's request for materials bearing upon the composition of the master jury wheel "resembles nothing more than a 'fishing expedition,'" United States v. Bass, No. 97-80235, slip op. at 15 (E.D. Mich. May 1, 2003) (Zatkoff, C.J.), and will not be allowed.

This leaves only Defendant's request for information and materials regarding the residency of the individuals who served on the grand jury in this matter. As noted earlier, it appears that the master jury wheel from which these grand jurors were drawn expired on September 30, 2006, and is no longer in use. Accordingly, the JSSA expressly dictates that "all records and papers compiled and maintained" by the Clerk of the Court with respect to this master wheel are "available for public inspection for the purpose of determining the validity of the selection of any jury." 28 U.S.C. § 1868. Defendant has not suggested why these publicly available records would not suffice to serve his objective of ensuring that the grand jurors were drawn from a fair cross section of the Detroit metropolitan community. Accordingly, Defendant must pursue this inquiry before seeking the disclosure of further information regarding the composition of the grand jury.[9]

### IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's April 11, 2008 motion to dismiss for violations of the Jury Selection and Service Act is GRANTED

---

[9] As noted earlier, Defendant indicates in his motion, and particularly in his reply brief, that he is seeking information in order to pursue challenges under both the JSSA and under an equal protection theory. Yet, while the elements of a claim under the JSSA and an equal protection claim are not identical, see Allen, 160 F.3d at 1103, 1105, there is a "significant[] overlap[]" in the two standards, Brown, 128 F. Supp.2d at 1043. To the extent that the Court has determined that Defendant's requests for materials exceed what is necessary to support a JSSA-based challenge, Defendant has not shown a need for this information in order to establish an equal protection violation. Rather, the Court believes that the information Defendant is authorized to obtain under the present ruling will suffice for both purposes.

IN PART and DENIED IN PART, in accordance with the rulings in this opinion and order. Specifically, Defendant will be provided the information contemplated under Administrative Order No. 00-AO-060 — juror number, race, and Hispanic ethnicity — for (i) the entire pool of 250 potential jurors to whom summonses were issued in this case, and (ii) the last fifteen venires drawn by the Clerk of the Court for the Detroit division. In addition, Defendant will be given access to the records and papers for the previous master jury wheel in accordance with 28 U.S.C. § 1868. In all other respects, Defendant's request for information bearing upon this District's juror selection process is denied.

s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated: April 29, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 29, 2008, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager